UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The White Earth Band of
Chippewa Indians, on its own
behalf and its wholly-owned
enterprise, the Shooting Star Casino,

      Plaintiffs,

v.

County of Mahnomen, Minnesota et al.,

      Defendants.

MEMORANDUM OPINION
AND ORDER
Civ. No. 07-3962 (MJD/RLE)

_____

      James T. Hamilton and Kevin C. Quigley, Hamilton Quigley & Twait PLC, for and on behalf of Plaintiffs.

      Scott G. Knudson and Daniel J. Supalla, Briggs and Morgan, P.A., for and on behalf of Defendants.

_____

**INTRODUCTION**

      This is an action for declaratory and injunctive relief and for money damages in response to the Defendants' alleged unlawful actions to assess and collect property taxes under state authority upon tribally owned lands located within the exterior boundaries of the White Earth Band Reservation.  Am. Comp., ¶ 1.

1

Plaintiffs, The White Earth Band of Chippewa Indians (hereinafter the "Band") purchased certain parcels of land in 1991 upon which the Band operates gaming operations at the Shooting Star Casino (the "Casino Property").  Id. ¶¶ 1, 8.  It is the Band's position that the Casino Property was purchased through funds made available in the White Earth Lands Settlement Act ("WELSA"), Pub. L. 100-153, Act of Nov. 5, 1987, 101 Stat. 886 (1986).  As such, the Casino Property is not subject to state taxation.  The Band seeks the refund of such real property taxes assessed and collected on the Casino Property for the tax years 1992 through 2005.  Id. ¶ 1.  The Defendants are Mahnomen County and its Treasurer, Auditor, Assessor and Commissioners (collectively "the County").

The matter is before the Court on cross motions of the parties.  The County moves to dismiss on Eleventh Amendment or abstention grounds.  The Band moves for summary judgment as to their claims for declaratory and injunctive relief, and the County has cross moved for summary judgment as to those claims.[1]

_____

[1]In response to the Band's motion for summary judgment [Doc. No. 52], which sought judgment only as to counts II, III and IV, the County filed its opposition and cross motion for summary judgment [Doc. No. 85].  In its cross motion, the County seeks summary judgment as to all counts asserted in the Complaint.  As the cross motion was filed on December 1, 2008, and addressed counts not covered in the Band's motion for summary judgment, the Band did not have enough time to respond to the County's motion prior to the hearing date on December 18,

2

**BACKGROUND**

The White Earth Reservation ("Reservation") was established in 1867

pursuant to the Treaty with the Chippewa of the Mississippi, Mar. 19, 1867, 16

Stats. 719, Ratified Apr. 8, 1867, Proclaimed Apr. 18, 1867.  (Quigley Aff., Ex. Nos.

1 and 2.)  When established, lands within the Reservation were not subject to

state property taxation.  Shortly thereafter, however, the lands were made subject

to the terms of the Indian General Allotment Act of 1887 ("IGAA"), 24 Stat. 388,

25 U.S.C. §§ 331, by passage of the Nelson Act of January 14, 1889 and the Clapp

Amendments of 1904 and 1906.

The IGAA established the national policy of breaking up Indian

reservations by allotting parcels of the reservation to individual Indians.

Manypenny v. United States, 948 F.2d 1057, 1060 (8th Cir. 1991).  The Nelson Act

applied the allotting policy to the Reservation providing each full or mixed-blood

allottee a trust patent under which the United States would hold the allotted land

for twenty-five years before conveying title to the allottee in fee.  Id.  Over the

next twenty years, the United States issued over 8,000 allotments.  Pursuant to

---

2008.  Accordingly, the Court will not address the County's motion with respect to the IGRA
and refund claims - counts I and V.

the Indian Reorganization Act of 1934, 48 Stat. 984 (1934) (codified at 25 U.S.C. § 462 (1988)), all trust periods then in existence were extended indefinitely.  Id.  The Clapp Amendment, enacted in 1906, purported to remove all restrictions on the sale of land allotted to adult mixed-blood Indians.  Id.  Conflicts over the proper interpretation of the Clapp Amendments led to many disputed land transactions. Id.  Thereafter, Reservation land holdings plummeted from approximately 830,000 to 57,000 acres. Id.

In State of Minnesota v. Zay Zah, 259 N.W.2d 580 (Minn. 1977), the Minnesota Supreme Court was asked to review a quiet title action with respect to real estate located within the Reservation.  The court ultimately determined that based upon applicable federal Indian law, land held in trust by a member of the tribe was not subject to state property taxation, unless the patent owner applies for, and receives from the United States, a fee patent.  Id. at 589.  As a result, a non-Indian who had obtained such lands within the Reservation through forfeiture proceedings lost title to such lands.

Following the Zay Zah decision, the Band asserts near panic occurred among non-Indian land owners on the White Earth Reservation, causing significant tension between Indians and non-Indians.  See generally, 131 Cong.

4

Rec. S17480-01 (Quigley Aff., Ex. No. 13); see also, Manypenny, 948 F.2d at 1059-

62.  To restore order following the Zay Zah decision and the uncertainties that

arose due to the applicable federal laws, Congress enacted WELSA to "settle

unresolved claims relating to certain allotted Indian lands on the White Earth

Indian Reservation, to remove clouds from the titles to certain lands and for other

purposes."  WELSA, Pub. Law 99-264, 100 Stat. 61 (1986); Manypenny, at 1061.

WELSA was meant to address "claims on behalf of Indian allottees or heirs and

the White Earth Band involving substantial amounts of land within the White

Earth Reservation in Minnesota [that] are the subject of existing and potential

lawsuits involving many and diverse interests in Minnesota, and are creating

great hardship and uncertainty for government, Indian communities and non-

Indian communities."  WELSA § 2 (1).

For example, through WELSA, titles were settled by "retroactively

ratifying land transactions, extinguishing claims, and authorizing compensation

to original allottees or their heirs from whom title was taken or transferred."

Manypenny, at 1061, WELSA §§ 6, 8.  In addition, WELSA provided for the

establishment of a $6,600,000 grant to the Band referred to as "The White Earth

Economic Development and Tribal Government Fund" and required the State of

Minnesota to donate 10,000 acres of land to the United States to be held in trust for the Band.  WELSA § 12(b), 10.

WELSA further provides that any lands within the exterior boundaries of the reservation acquired through this fund "shall be held in trust by the United States.  Such lands shall be deemed to have been reserved from the date of the establishment of said reservation and to be part of the trust land of the White Earth Band for all purposes."  WELSA § 18.

The Band alleges that after it acquired the Casino Property with WELSA funds, the Band negotiated gaming compacts with the State of Minnesota pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § § 2701 et seq. ("Compacts").  The Compacts did not provide for the payment of any taxes on any gaming activity consistent with IGRA.  Id.  Thereafter, in 1995, the Band applied to the federal government to put the Casino Property into trust.  At that time, the Band asserts it also underwent significant crises within its tribal government, which resulted in governmental dysfunction and turmoil from 1996 through 2001.  Am. Comp. ¶ 12.  As a result of this dysfunction, the trust application was not vigorously pursued.  Id.

6

After the Band purchased the property in 1991, the County treated the

Casino Property as unrestricted fee land, and assessed property taxes thereto.

After construction of the Shooting Star Casino on the Casino Property, the

assessed property taxes significantly increased due to the corresponding increase

in the property values.  Id. ¶ 13.

In 2002, the Band again pursued its trust application.  The Bureau of Indian

Affairs ("BIA") eventually determined that "the White Earth Band used White

Earth Land Settlement Act funds, and/or earnings of the funds, for the purchase

of the fee parcels for the Shooting Star Casino in Mahnomen County, Minnesota."

Plaintiffs Ex. 1 (Bates No. 000199).  A Notice of Intent to take the Casino Property

into trust as a mandatory acquisition was forwarded to the affected governments.

Id. ¶ 15.

The State of Minnesota properly appealed this decision to the Interior

Board of Indian Affairs ("IBIA").  The County, however, did not file a timely

appeal.

By Order dated July 3, 2008, the IBIA affirmed the decision of the BIA.  The

IBIA specifically found that the record supported the Regional Director's

decision, which included the Office of Indian Gaming Management's ("OIGM")

7

analysis of the financial documents, together with supporting documents.  <u>State of Minnesota v. Acting Midwest Regional Director</u>, 47 IBIA 122, 127 (2008) (Quigley Aff., Ex. No. 5.)[2]

The Band asserts that the payments of property taxes since 1992 have been a significant and severe hardship.  Am. Comp. ¶ 17.  In 2006, after receiving the BIA's decision, the Band withheld further payment of property taxes, placing those amounts in escrow.  <u>Id.</u>  The Band commenced a federal mediation process with the County, but no settlement has been reached.  <u>Id.</u> ¶ 18.

On February 2, 2007, the Minnesota State District Court for the Ninth District issued a Notice of Delinquent Taxes.  The Notice provided that the "listed property is subject to forfeiture because of delinquent taxes."  <u>Id.</u> ¶ 20.  The Band responded pursuant to Minn. Stat. § 278.01.  Venue was transferred to the Minnesota Tax Court ("Tax Court Action").  The judge in the Tax Court Action agreed to determine the sufficiency of the BIA's decision that: 1) WELSA funds were used to purchase the Casino Property; 2) if such funds were used, the status

---

[2]There is another action pending before this Court, <u>Mahnomen County v. Bureau of Indian Affairs, et al.</u>, Civil No. 08-5180, in which the County challenges the BIA's decision to put the Casino Property into trust.  By Memorandum Opinion issued contemporaneously with this Memorandum Opinion, the Court has affirmed the decision of the BIA and dismissed the County's Complaint.

of lands under mandatory acquisition - that is whether such acquisition creates a

restriction on land that preempts state taxation; and 3) whether IGRA preempts

the imposition of property taxes on tribal lands used for gaming purposes.  Id. ¶

21.  Because the Band believed the issues identified by the Tax Court for

resolution are exclusively federal, and because it believed it to be in the best

interests of the parties, the Band dismissed the Tax Court Action and thereafter

filed this action.  Id. ¶ 22.  The tax delinquency proceeding initiated by the

County in state district court was not affected by the Band withdrawing its

petition in the Tax Court Action.  (Larson Aff., Exs. E and F.)

In the Amended Complaint, the Band seeks declaratory relief, injunctive

relief and money damages in the form of "disgorgement and replevin of all real

estate property taxes wrongly assessed and collected by Defendants on the

Casino Property since 1991, plus statutory interest, costs, fees and other such

relief as the Court determines."  Am. Comp. ¶ 42.

## I.   County's Motion to Dismiss on Eleventh Amendment or Abstention Grounds

### A.   Eleventh Amendment

The Eleventh Amendment provides, "[t]he Judicial power of

the United States shall not be construed to extend to any suit in

9

law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The United States Supreme Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985). The Eleventh Amendment applies to suits by Indian tribes against a State. <u>In re State of New York</u>, 256 U.S. 490, 500 (1921). It also applies to bar a suit in which the State is not named as a defendant, but where the judgment will necessarily be paid out of the state treasury. <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974).

### 1.     Money Damages - Effect on State Treasury

The County argues that although it is not a state agency, the Eleventh Amendment applies to bar the Band's refund claim because a portion of the money damages sought, the refund of all property taxes paid, will come from the state treasury given the design and operation of Minnesota's property tax laws.

Minnesota law provides what property is taxed, how taxes are assessed, how much can be collected, how taxes are collected from property owners and how the taxes are allocated and distributed. <u>See</u> Minn. Stat. § 271.01, subd. 5

(defining tax laws).  The County argues that pursuant to Minnesota law, any

refund the Band seeks would be "charged to the state and other taxing districts in

proportion to the amount of their respective taxes included in the levy."  Minn.

Stat. § 278.12.  Only where the levy by a particular authority is illegal would that

taxing authority be solely liable.  <u>Id.</u>  In this case, however, the Band is

challenging the assessment of any and all property taxes on the Casino Property,

therefore no taxing authority could retain the tax.  It therefore follows that if the

Band were to succeed in its claims, the state treasury would be affected because

beginning in 2002, the State of Minnesota imposed a general levy on commercial-

industrial property.  Since this levy was imposed, the State has received

approximately one-third of all property tax payments that the County Auditor

and County Treasurer have collected from the Band.  As a result, the Band has

paid $1,150,455 to the State in the form of property taxes through 2005.  Since any

judgment in the Band's favor will be satisfied in part by the State, the County

argues this suit is barred by the Eleventh Amendment.

The Band responds that the Eleventh Amendment does not bar its claim

for money damages because the State of Minnesota has not been named as a

defendant, and that no claim has been made for a refund of taxes paid to the

State.  The specific levy charged each year by the County on the Casino Property

is listed on each year's tax statement, so the amount of refund from the County

would be easily ascertainable.  In addition, the Band asserts it is not seeking a

refund under Minn. Stat. § 278.  Rather, the Band is seeking unjust enrichment

damages from the County on the theory that the property taxes assessed and

levied against the Casino Property violated federal law.  It is the Band's position

that the federal courts have jurisdiction to craft such relief as may be appropriate

under the circumstances.

        Despite its characterizations to the contrary, it is clear that the Band is

seeking a tax refund.  In the Amended Complaint, the Band clearly asserts that it

"seeks the refund of such real property taxes wrongfully assessed and collected

on the Casino Property for the tax years 1992 through 2005."  Am. Comp. ¶ 1.  In

Count V, the Band has asserted that it is "entitled to disgorgement and replevin

of all **real property taxes** wrongfully assessed and collected by Defendants on the

Casino Property since 1991, plus statutory interest, costs, fees and other such

relief as the Court determines."  Am. Comp. ¶ 42 (emphasis added.)  Because it is

clear that the Band is seeking a refund of property taxes assessed and collected

with respect to the Casino Property, the question becomes whether Minnesota tax

laws provide the exclusive remedy for the Band's claims for money damages.

Minn. Stat. § 278.01 provides that any person who believes a property tax levied against certain lands is illegal or that property is exempt from a tax so levied "may have the validity of the claim, defense, or objection determined by the district court of the county in which the tax is levied or by the Tax Court." The Minnesota Supreme Court has held that when a claim falls within the categories listed in Section 278.01, such statute provides the exclusive remedy to seek a tax refund. Programmed Land, Inc. v. O'Connor, 633 N.W.2d 517, 520 (Minn. 2001). See also Peoples State Bank Truman v. Triplett, 633 N.W.2d 533, 539 (Minn. Ct. App. 2001) (holding that the tax-refund statute is the exclusive remedy to recover for unconstitutionally discriminatory excise taxes, and the statute's time limitation cannot be avoided by an action for unjust enrichment).

As noted above, it is clear that the Band is seeking a refund of property taxes on the grounds that such taxes were levied against land that is exempt from state taxation pursuant to federal law. As such, the Band's claim falls within Minn. Stat. § 278.01. Furthermore, the Band has put forth no authority which would allow the Band to seek a selective refund of property taxes paid. Minnesota law provides that where it is determined that a refund is required, the

13

refund claim shall be "charged to the state and other taxing districts in proportion to the amount of their respective taxes included in the levy."  Minn. Stat. § 278.12.  Finally, the Band has put forth no authority in support of the assertion that this Court has jurisdiction to fashion appropriate relief as the taxes were assessed and collected in violation of federal law.

The Band does cite to <u>Board of County Comm'rs of Creek County v. Seber</u>, 319 U.S. 50 (1943), which decision affirmed a judgment granting a property tax refund to an individual Indian.  The Court finds, however, that <u>Seber</u> does not support federal jurisdiction over the Band's refund claim.  First, the issue of Eleventh Amendment immunity was not raised in <u>Seber</u>, and it is unclear whether the state treasury would have been affected by the refund claim asserted in <u>Seber</u>, as is claimed in this case.  Second, in the lower court decision that was affirmed by the Supreme Court in <u>Seber</u>, the Tenth Circuit Court of Appeals held that although federal law exempted the lands at issue from state taxation,

> there is nothing in the acts here involved indicating an intention or purpose to disrupt the orderly procedure by which the State of Oklahoma pursues its statutory scheme of taxation, so long as such procedure does not circumvent or proscribe the declared purpose of the national enactment.  We see no reason here to depart from the orderly procedure as outlined by the state law in the determination of the period in which the respective exempting acts have application to the lands embraced within

14

the compass of the Acts.  The right to be vindicated is a Federal right, but state laws have a distinct relevancy and they are entitled to a respectful consideration.  Their observance here will result in a synchronization of state and Federal law and give vitality to both, while to ignore them would result in doubt and confusion.

Board of County Comm'rs of Creek County v. Seber, 130 F.2d 663, 670 (10th Cir. 1942).   Applying state law, the Tenth Circuit determined in which years refunds were appropriate.  Id. 670-671.

Similarly, there is nothing in WELSA which indicates an intention or purpose to disrupt the comprehensive procedures by which to claim tax refunds set forth in Minnesota law.  While federal law clearly dictates whether the Casino Property is subject to taxation, the same cannot be said for the applicable procedures by which to seek a refund of property taxes wrongly paid. Accordingly, the procedures set forth in Minn. Stat. § 278 apply to the Band's claim for property tax refunds.  As such, if the Band succeeds in its refund claim, the State, as well as the County and other taxing districts, will be required to reimburse the Band for property taxes wrongfully collected.  Accordingly, the Court finds that the Band's claim for money damages will impact the State's treasury.

## 2.  No Waiver of Immunity

The County further argues that neither the State nor the County has expressly or impliedly waived immunity from suit concerning tax refunds.  The Band does not respond to this argument.  Based on its review of state law, the Court finds that the State has not waived immunity from suit concerning refund claims.

### 3.  Congress Has not Abrogated Eleventh Amendment Immunity

Finally, the County argues that Congress has not abrogated the State's Eleventh Amendment immunity.  The United States Supreme Court has ruled that for Congress to abrogate Eleventh Amendment immunity, it must do so by "unequivocally expressing its intent to abrogate the immunity" and that Congress must act "pursuant to a valid exercise of power."  <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 55, 58 (1995).  In <u>Seminole Tribe</u>, the Court held that although Congress has the exclusive power to regulate Indian affairs pursuant to the Indian Commerce Clause, such clause does not grant Congress the power to abrogate a state's Eleventh Amendment immunity.  <u>Id.</u> at 72.  The Court thus held that the Seminole Tribe's claim against the State of Florida, pursuant to IGRA, was barred by the Eleventh Amendment.

The Eighth Circuit has determined that WELSA did not abrogate the

State's Eleventh Amendment immunity.  See Manypenny, 948 F.2d at 1066

(holding that Minnesota did not waive its Eleventh Amendment immunity by

participating in the settlement of the White Earth Reservation land title disputes

that led to the enactment of WELSA).

Finally, the County asserts that by enacting 28 U.S.C. § 1362, Congress did

not abrogate the State's immunity from suit.  Blatchford v. Native Village of

Noatak, 501 U.S. 775 (1991) (affirming dismissal of Alaska Native's suit against

Alaska official seeking money allegedly owed them under a state revenue

sharing statute).   The Band does not appear to dispute the County's assertions

that Congress did not abrogate the State's Eleventh Amendment immunity

pursuant to IGRA or WELSA with respect to its claim for money damages.  The

Band does seek to clarify, however, that 28 U.S.C. § 1362 precludes Eleventh

Amendment immunity protection in cases brought by Indian tribes to obtain

injunctive and declaratory relief.  See Moe v. Confederated Salish & Kootenai

Tribes, 425 U.S. 463 (1976); Sac & Fox Nation of Missouri v. Pearce, 213 F.3d 566

(10th Cir. 2000).

Title 28 U.S.C. Section 1362 provides:

> The district court shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

In <u>Moe</u>, an Indian tribe and some of its members brought actions challenging Montana's cigarette sales taxes and property taxes as applied to reservation Indians, seeking declaratory and injunctive relief.  425 U.S. at 467-469. The Court addressed the issue of whether the district court had jurisdiction to entertain such a suit, in light of the Tax Injunction Act, which provides that:

> [t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

<u>Id.</u> at 470 (quoting 28 U.S.C. § 1341).  The Court noted that the suit was brought pursuant to 28 U.S.C. § 1362.  <u>Id.</u> at 472.  Because §§ 1341 and 1362 do not reference the other, the Court looked to the legislative history of § 1362 and determined that such history indicated a congressional purpose to open federal courts to the kind of claims that could have been brought by the United States as trustee.  <u>Id.</u>

> While [the legislative history] is hardly an unequivocal statement of intent to allow such litigation to proceed irrespective of other explicit

> jurisdictional limitations, such as § 1341, it would appear that Congress
> contemplated that a tribe's access to federal court to litigate a matter
> arising 'under the Constitution, laws or treaties' would be at least in some
> respects as broad as that of the United States suing as the tribe's trustee.

Id. at 473.  The Court then determined that the United States could have brought

this claim on behalf of the Indian tribe.  Id.  "Since the United States is not barred

by § 1341 from seeking to enjoin the enforcement of a state tax law . . . we hold

that the Tribe is not barred from doing so here."  Id. at 474-475.

While in Blatchford, the Court found that § 1362 did not operate as a

general waiver of a state's sovereign immunity, Blatchford did recognize the Moe

decision, and distinguished Moe as specifically seeking "injunctive relief from

state taxation."  Blatchford, 501 U.S. at 784.  "Moe did not purport to be saying that

§ 1362 equated tribal access with the United States' access generally, but only 'at

least in some respects' . . . or 'in certain respects.'"  Id.; see also Sac & Fox Nation,

213 F.3d at 572 (finding federal jurisdiction to address Tribe's challenge of a state's

motor fuel distribution tax, following Moe).

This Court similarly finds that it has jurisdiction to decide the merits of the

Band's claims for declaratory and injunctive relief.  The County argues that the

Band's claims for prospective relief drop out of this case given the BIA's decision

19

that the Casino Property was purchased with WELSA funds and thus taken into trust.  This is a curious position, however, given the fact that the County is challenging the BIA's decision in a separate action.  (See Mahnomen County v. The Bureau of Indian Affairs, et al., Civil No. 08-5180 (MJD/RLE).)  In addition, despite the BIA's decision that was issued in 2006, the County initiated a tax delinquency proceeding after the Band ceased paying the assessed property taxes in 2006, and this proceeding remains pending.  Finally, as discussed later in this Memorandum Opinion, the parties contest the proper interpretation of WELSA § 18.   It thus appears that the Band's claims for prospective relief remain at issue.

Based on the above, the Court finds that the Band's claim for money damages only is barred by the Eleventh Amendment.  See Yakama Indian Nation v. Locke, 176 F.3d 467 (9th Cir. 1999) (Indian tribe's claim for damages against State dismissed as barred by the Eleventh Amendment).

### B.   Younger Abstention

In Younger v. Harris, 401 U.S. 37 (1971), the Supreme Court directed lower courts to abstain from hearing cases before it when there is an ongoing state judicial proceeding that implicates important state interests and when that proceeding affords an adequate opportunity to raise the federal questions

presented.

The County argues that <u>Younger</u> applies here because there is an ongoing

state proceeding - the County's tax delinquency proceedings.  (Larson Aff., Exs. E

and F.)  The County further asserts that important state interests are at stake here.

Minnesota has enacted a tax structure that regulates and manages all aspects of

property tax assessment and collection.  This litigation also implicates the State's

interest in collecting the state general levy from all counties.  Thus, the State faces

financial exposure if the Band prevails.  Finally, the County argues that there is an

adequate opportunity to raise all issues in the Minnesota Tax Court proceeding.

Minnesota state courts routinely interpret and apply applicable federal law.

The Band responds that <u>Younger</u> abstention should not apply here because

the central and threshold issues in this case are those of federal Indian law.

Specifically, whether property taxes may be assessed on the Casino Property,

pursuant to WELSA and IGRA.  As such, neither the State or the County has a

decision-making interest in issues of federal Indian law.  Rather, it has an interest

in the outcome of a federal decision on federal Indian law issues.  <u>See</u> <u>Winnebago</u>

<u>Tribe of Nebraska v. Stoval</u>, 341 F.3d 1202 (10th Cir. 2003).

In <u>Winnebago</u>, the Tenth Circuit Court of Appeals upheld the district

court's determination not to abstain pursuant to <u>Younger</u> on the basis that the

second <u>Younger</u> factor, an important state interest, had not been met.  <u>Id.</u> 341 F.3d

at 1205.  In <u>Winnebago</u>, there was an ongoing state court proceeding involving

seizure of tribal property and criminal proceedings because the tribe failed to pay

a tax.  The court determined that abstention was not an appropriate bar to federal

consideration of claims asserted because:

> [t]he central and threshold issues in this case are federal Indian law issues, i.e. whether federal law bars the state from imposing the tax, whether federal law preempts the state tax scheme as applied to plaintiff Indian tribes, and whether the state's enforcement violates tribal sovereign immunity, issues which must be resolved before the state criminal proceedings can go forward.  The state prosecutions are based on allegations that assume the state can apply its law to these parties.

<u>Id.</u> at 1205.

This Court agrees that <u>Younger</u> abstention is not appropriate in this case.

Without question, whether the Casino Property can and should be assessed

property taxes is solely a matter of federal Indian law.  In particular, this

determination will depend on an interpretation of federal law.  <u>See</u>

<u>Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson</u>, 874 F.2d 709

(10th Cir. 1989) (finding that where the central issue is not one of state law, the

importance of the State's interest in the state litigation is minimal).  In addition,

matters of state taxation of Indian tribes have traditionally been addressed by

federal courts.  See e.g., Cass County v. Leech Lake Band of Chippewa Indians,

524 U.S. 103 (1998); County of Yakima v. Yakima Indian Nation, 502 U.S. 251

(1992); Goudy v. Meath, 203 U.S. 146 (1906).

### C.    Colorado River Abstention

Abstention under Colorado River Water Conservation v. United States, 424

U.S. 800 (1976) is intended to avoid piecemeal litigation.  Generally, courts apply

six factors to determine whether abstention under this doctrine is appropriate:

> (1) whether there is a res over which one court has established jurisdiction,
> (2) the inconvenience of the federal forum; (3) whether maintaining separate
> actions may result in piecemeal litigation, unless the relevant law would
> require piecemeal litigation and the federal court issue is easily severed; (4)
> which case has priority - not necessarily which case was filed first but
> greater emphasis on the relative progress made in the cases; (5) whether
> state or federal law controls, especially favoring the exercise of jurisdiction
> where federal law controls; and (6) the adequacy of the state forum to
> protect the federal plaintiff's rights.

Mountain Pure, LLC v. Turner Holdings, LLC, 439 F.3d 920, 926 (8th Cir. 2006).

The Court finds that abstention under Colorado River is not warranted in

this case because federal Indian law controls the central issues in this litigation,

specifically whether the Casino Property is subject to property taxation.  The

Court is further concerned that the state's forum may not be adequate here, given

the long and contentious history between the White Earth Band and non-Indian governments.  While the ongoing state proceedings may result in piecemeal litigation, the Court finds that the balance of the factors weighs against abstention.  Accordingly, the Court declines to dismiss this action pursuant to <u>Colorado River</u>.

## II.  Plaintiffs' Motion for Summary Judgment as to Counts II, III and IV

In Counts II and III of the Amended Complaint, the Band seeks the following declaratory relief: that the Casino Property is not subject to *ad valoreum* property taxation by the State of Minnesota or its political subdivisions since the date the Casino Property was purchased with WELSA funds; and that the Casino Property is not subject to state judicial process that would result in seizure of the Casino Property.  In Count IV, the Band seeks an order enjoining the County from any action assessing, collecting or enforcing *ad valoreum* property taxes on the Casino Property, including prosecution of the foreclosure action noticed by the County pursuant to Minnesota Statutes § 279.

It is the Band's position that application of Section 18 of WELSA precludes state property taxation of the Casino Property.

### A.      Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u> at 325.  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir.1995).

### B.    Canons of Construction

In matters involving federal Indian law, the Court must apply a discrete set of canons of construction.  These canons require that treaties, agreements, statutes and executive orders be liberally construed in favor of the Indians.  <u>Yakima</u>, 502 U.S. at 269 (citing <u>Montana v. Blackfeet Tribe</u>, 471 U.S. 759, 766 (1985)).  In addition, to the extent that federal Indian law is ambiguous, any ambiguity is construed liberally in favor of the Indians.  <u>Id.</u>  The Court will apply these canons in addressing the parties' various arguments.

## C.   Does Application of Section 18 Preclude Property Taxation?

Section 18 of WELSA provides:

SEC. 18.  Any lands acquired by the White Earth Band within the exterior boundaries of the White Earth Reservation with funds referred to in section 12, or by the Secretary pursuant to section 17, shall be held in trust by the United States.  Such lands shall be deemed to have been reserved from the date of the establishment of said reservation and to be part of the trust land of the White Earth Band for all purposes.

As Congress has plenary and exclusive authority over Indian affairs, it is within Congress' power to declare that certain lands are "reserved" in trust for the benefit of an Indian tribe, and shall remain reserved despite objection to the contrary by an executive agency or state.  United States v. Lara, 541 U.S. 193, 200 (2004).  The Band argues that through WELSA, Congress has exercised this power by providing that any lands purchased with WELSA funds "shall be held in trust by the United States" and "shall be deemed reserved" for the benefit of the Band.  As the language of Section 18 is clear and unambiguous, the Band further argues that Congress has indicated its intent that Section 18 of WELSA be automatic, immediate and mandatory.

The County responds that the proper interpretation of Section 18 starts with the presumption of taxability.  Relying on Goudy, 203 U.S. 146, County of Yakima,

502 U.S. 251 and Cass County, 524 U.S. 103, the County argues it is well-settled

that once Congress has manifested its intention to permit taxation of tribal-owned

lands, "Congress would have to 'clearly manifest' such a contrary purpose in

order to counteract the consequence of taxability that ordinarily flows from

alienability."  Cass County, 524 U.S. at 112 (citing Goudy, 203 U.S. at 149.)  It is the

County's position that WELSA does not clearly manifest an intent to preclude the

County from assessing and collecting property taxes from the Band with respect

to the Casino Property.  The Court disagrees.

The language of Section 18 is clear and unambiguous.  It clearly provides

that lands located within the exterior boundaries of the White Earth Reservation

and purchased with WELSA funds "shall be held in trust by the United States."

Lands held in trust by the United States for the benefit of the Band are not subject

to taxation.  Section 18 further provides that such lands - that is lands located

within the exterior boundaries of the reservation and purchased with WELSA

funds [3] - "shall be deemed to have been reserved from the date of the

establishment of said reservation and to be part of the trust land of the White

---

[3]The Court would note that the County's interpretation of "such lands" as referring only
to lands held in trust by the United States, which in turn refers to certain lands disestablished
by the Nelson Act, is nonsensical.

Earth Band for all purposes."  There appears to be no dispute that when the

Reservation was created in 1867, the Reservation lands were not subject to

taxation.  Thus, even though WELSA does not include the specific language that

lands acquired pursuant to Section 18 are "non-taxable", Congress nonetheless

clearly manifested its intent to preclude *ad valoreum* taxation on lands located

within the exterior boundaries of the Reservation and purchased with WELSA

funds by deeming such land "to have been reserved from the date of the

establishment of said reservation and to be part of the trust land . . . for all

purposes."

In <u>Seber</u>, the United States Supreme Court addressed a similar statute

which provided that certain Indian lands would be immune from state taxes if

two requirements were met: that the title to the lands be held by an Indian subject

to restrictions against alienation or encumbrance or approval of the Secretary of

the Interior; and the lands were purchased out of trust or restricted funds.  318

U.S. at 709.  As these requirements were met, the Court found that the land at

issue was immune from state taxation.  <u>Id.</u>

The County further argues that the Band's interpretation of Section 18 as

"self-executing" or "automatic" should be rejected as there is no language in

Section 18 which supports such an interpretation, and that applicable federal regulations require that certain prerequisites must be met before land can be accepted into trust.

First, as the Band points out, this case does not involve land acquisition pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465. Rather, WELSA is a unique statute which, on its face, provides that certain land acquisitions shall be held in trust *and* shall be deemed reserved from the date of the establishment of the Reservation and to be part of the trust land of the Band for all purposes. Thus, while there is a process contemplated for "mandatory acquisitions" in the implementing regulations of § 465, and such procedures were correctly followed by the Secretary in response to the Band's trust application in this case, Section 18 of WELSA is, by its terms, self-executing or automatic.

It is important to note that the "mandatory fee-to-trust" procedures set forth in 25 C.F.R. Part 151 are different from the procedures required for discretionary acquisitions. These regulations set forth the procedures "governing the acquisition of land by the United States in trust status for individual Indians and tribes." 25 C.F.R. § 151.1. These regulations further provide that land may not be acquired in trust status for a tribe unless authorized by Congress. 25 C.F.R. §

151.3.  When a Band seeks to acquire land in trust status, the Band "shall file a

written request for approval of such acquisition with the Secretary.  The request

need not be in any special form but shall set out the identity of the parties, a

description of the land to be acquired, and other information which would show

that the acquisition comes within the terms of this part."  25 C.F.R. § 151.9.  When

a request to have lands taken into trust is received by the Secretary, the Secretary

is to notify the state and local governments "unless the acquisition is mandated by

legislation."  25 C.F.R. § 151.10.

       When an acquisition is left within the discretion of the Secretary, the

regulations dictate that notice be sent to the state or local government affected to

allow written comments as to the acquisition's potential impacts on regulatory

jurisdiction, real property taxes and special assessments.  25 C.F.R. § 151.10.  If the

state or local government responds, a copy of said comments shall be given to the

applicant.  Thereafter, the Secretary is to consider a number of factors in

evaluating the requests for acquisition of land, such as the existence of statutory

authority for the acquisition, the need of the individual Indian or Tribe, and the

purposes for which the land will be used.  Id.  The County argues that the Band

did not follow these procedures, and that such procedures must be met before the

Casino Property can be placed into trust.  As noted above, however, these

procedures apply only to discretionary acquisitions.

The issue here, however, is whether lands acquired pursuant to Section 18

are discretionary acquisitions or mandatory acquisitions.  Section 18 directs that

lands located within the exterior boundary of the Reservation, and purchased

with WELSA funds "shall" be held in trust.  As "shall" is a mandatory term, its

use in Section 18 indicates a lack of discretion on the part of the Secretary.

Accordingly, with regard to Section 18 acquisitions, it is unnecessary to follow the

procedures set forth in § 151.10.  See Confederated Salish & Kootenai Tribes v.

United States ex. rel. Norton, 343 F.3d 1193, 1194-95 (9th Cir. 2003) (stating that

Section 151.10 requires the Secretary to provide notice to state and local

governments before approving discretionary land acquisitions); Nevada v. United

States, 221 F. Supp.2d 1241, 1246-47 (D. Nev. 2002) (finding that statute which

provided that lands purchased with certain funds "shall be taken into trust" was

mandatory, and that the BIA is not required to follow the procedures set forth in

25 C.F.R. § 151.10 for discretionary acquisitions); Churchill County v. United

States, 199 F. Supp.2d 1031, 1033 (D. Nev. 2001)(same); Sault Ste. Marie Tribe of

Lake Superior v. United States, 78 F. Supp.2d 699, 703 (W.D. Mich. 1999)(same).

In 2002, the Band formally requested the BIA to take the Casino Property into trust as a mandatory acquisition under Section 18 of WELSA.  (See Complaint ¶ 14.)  In response to the request, the Office of the Solicitor, for the Department of the Interior, took the position that a process should be followed prior to placing the Casino Property into trust status.  (Larson Aff., Ex. 14, p. 3 ("The second issue which should be finally resolved before the trust process proceeds is a determination that the property was purchased with funds from the [WELSA] which was created by Section 12 of WELSA.").)  Thereafter, the BIA took the necessary steps to determine whether WELSA funds were used to purchase the Casino Property.  Once it was satisfied that WELSA funds were, in fact, used, the Secretary made the determination that WELSA mandated that the Casino Property be placed in trust status.  State of Minnesota, 47 IBIA at 127 (Quigley Aff., Ex. No. 5) (finding that mandatory acquisitions are not subject to the discretionary criteria of 25 C.F.R. Part 151).  As noted previously, this Court has affirmed the Secretary's decision.  (See Mahnomen Count v. The Bureau of Indian Affairs, Civil No. 08-5180 (MJD/RLE).)

As there are no genuine issues of material fact, and the law clearly provides that the Band is entitled to the relief sought, the Court will grant the Band's

32

motion as to Counts II, III and IV.

**CONCLUSION**

Although it has been seventeen years since the Band purchased the Casino Property, during which time the nature and use of said property drastically changed, the Court must nonetheless keep in mind that WELSA was enacted to settle land claims of Indians and non-Indians alike.  And because one of the purposes of WELSA was to compensate for Indian lands wrongly alienated by federal law, WELSA must be construed liberally in favor of the Band.  Given the clear and unambiguous language contained in Section 18 of WELSA, lands acquired pursuant to this section are not subject to *ad valoreum* state taxation.

IT IS HEREBY ORDERED THAT:

1.    The Defendants' Motion to Dismiss [Doc. No. 25] is GRANTED in part and DENIED in part.  The Motion is GRANTED as to Plaintiffs' claim for money damages, Count V, and such claim is DISMISSED WITHOUT PREJUDICE.  The Motion is DENIED with respect to Counts I-IV.

2.    The Plaintiffs' Motion for Summary Judgment as to Counts II, III and IV [Doc. No. 52] is GRANTED.

3.    The Defendants' Cross Motion for Summary Judgment [Doc. No. 85] is DENIED as to Counts II, III and IV, and DISMISSED as untimely as to Counts I and V.

4.     It is Declared that the Casino Property is not now, and has not been, subject to *ad valoreum* property taxation by the State of Minnesota or its political subdivisions since the date in 1991 the lands were acquired with WELSA funds by the Plaintiffs.

5.     Defendants are permanently enjoined from taking any action assessing, collecting or enforcing *ad valoreum* property taxes on the Casino Property, including prosecution of any foreclosure action noticed by Defendants pursuant to Minnesota Statutes Chapter 279.


Date:   March 24, 2009

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court